**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CATHY LUTIZIO,** | ) | **CASE NO. 1:17CV1805** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE** |
| | ) | **JONATHAN D. GREENBERG** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner** | ) | |
| **of Social Security,** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **Defendant.** | ) | |

Plaintiff, Cathy Lutizio ("Plaintiff" or "Lutizio"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is VACATED and the case

REMANDED for further consideration in light of this decision.

## I.   PROCEDURAL HISTORY

In April 2014, Lutizio filed an application for SSI alleging a disability onset date of

November 24, 2009[2] and claiming she was disabled due to "short [term] memory problems, back

───────────────

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

[2] Lutizio later amended her onset date to April 28, 2014.  (Tr. 56, 231.)

injury, major depression, aortic aneurism, chronic bronchitis, arthritis, spot on lung, PTSD, and

borderline bipolar." (Transcript ("Tr.") at 10, 210, 237.) The applications were denied initially

and upon reconsideration, and Lutizio requested a hearing before an administrative law judge

("ALJ").[3] (Tr. 10, 162-164, 170-171, 174.)

On March 18, 2016, an ALJ held a hearing, during which Lutizio, represented by

counsel, and an impartial vocational expert ("VE") testified. (Tr. 52-101.) On May 26, 2016,

the ALJ issued a written decision finding Lutizio was not disabled. (Tr. 10-20.) The ALJ's

decision became final on July 14, 2017, when the Appeals Council declined further review. (Tr.

1-6.)

On August 29, 2017, Lutizio filed her Complaint to challenge the Commissioner's final

decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 17.)

Lutizio asserts the following assignments of error:

(1)     The ALJ erred in rejecting treating physician opinion evidence with a
        generalized and perfunctory reason.

(2)     The ALJ's determination of Ms. Lutizio's physical residual functional
        capacity is not supported by substantial evidence.

(Doc. No. 15.)

## II.    EVIDENCE

---

[3] The record reflects that Lutizio filed a previous application in April 2010 for a period
of disability ("POD"), disability insurance benefits ("DIB"), and SSI, alleging a disability
onset date of November 24, 2009. (Tr. 105.) After conducting a hearing, an ALJ issued
a decision on October 17, 2012 finding Lutizio was not disabled. (Tr. 105-119.) In the
instant case, the ALJ found *Drummond v. Comm'r of Soc. Sec* ., 126 F.3d 837 (6th Cir.
1997) did not apply because there was new and material evidence; i.e., evidence that
Lutizio "has additional and more severe physical impairments, including bilateral carpal
tunnel syndrome." (Tr. 10.)

**A.      Personal and Vocational Evidence**

Lutizio was born in January 1963 and was fifty-three (53) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations.  (Tr. 19, 210.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has a limited education and is able to communicate in English.  (Tr. 19.)  She has past relevant work as a waitress (light, semi-skilled, SVP 3); clerk cashier (light, unskilled, SVP 2); office cleaner (light, unskilled, SVP 2); assembler worker (light, semi-skilled, SVP 3); and bartender (light, semi-skilled, SVP 3).  (Tr. 19.)

**B.      Relevant Medical Evidence[4]**

On February 8, 2013, Lutizio presented to the emergency room ("ER") with complaints of back, knee, finger, and facial pain after having fallen two weeks previously.  (Tr. 371-374.)  Examination revealed normal muscle strength and gait but tenderness in Lutizio's left fourth finger and left lumbar paraspinal region.  (Tr. 372.)  An x-ray of Lutizio's left hand taken that date showed: (1) a distal segment avulsion fracture; (2) "advanced osteoarthtic changes within the 1st carpometacarpal joint with joint space narrowing and spurring," and (3) minor degenerative spurring within the 3rd metacarpophalangeal joint. (Tr. 373, 435.)  Lutizio's fracture was immobilized and she was discharged in stable condition.  (Tr. 374.)

On May 22, 2013, Lutizio underwent an x-ray of her right knee, which revealed "advanced medial femorotibial compartment narrowing, mild to moderate lateral and medial

---

[4] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, because Lutizio's assignments of error relate solely to her physical impairments, the Court will confine its discussion of the medical evidence to those impairments.

patellofemoral narrowing with tricompartmental osteophytes" and a small joint effusion. (Tr. 544.)

Lutizio presented to primary care physician Anthony J. Finizia, M.D., the following day. (Tr. 365.) She complained of right side neck tingling radiating to her right arm. (*Id.*) Examination revealed mild paraspinal spasm but was otherwise normal. (*Id.*) Dr. Finizia noted a diagnosis of cervical spondylosis and ordered imaging of Lutizio's neck "for etiology of radicular symptoms." (*Id.*)

On June 4, 2013, Lutizio underwent an x-ray of her cervical spine. (Tr. 433.) It revealed moderately severe degenerative disease and noted as follows: "There is narrowing of multiple intervertebral disc spaces and intervertebral neural foramina. Spurring is noted from multiple endplates anteriorly. There is no evidence of fracture or dislocation. Increased reactive sclerosis of the facet joint at the C7-T1 level is present." (*Id.*)

Lutizio returned to Dr. Finizia on June 6, 2013 with continued complaints of right neck pain and right arm numbness and tingling. (Tr. 363-364.) He assessed cervical spondylosis without myelopathy and referred her for a course of physical therapy. (*Id.*)

On July 3, 2013, Lutizio presented to Dr. Finizia with complaints of right neck numbness radiating to her right upper arm and right leg numbness. (Tr. 361-362.) On examination of Lutizio's neck, Dr. Finizia noted painful range of motion with left rotation and no spasms. (*Id.*) With regard to her extremities, he noted normal upper extremity reflexes and strength. (*Id.*) He does not appear to have examined her back or lower extremities. Dr. Finizia assessed cervical radiculitis and lumbar radicular pain. (*Id.*) He ordered x-rays of her lumbar spine and increased her Neurontin and Pamelor. (*Id.*)

Lutizio underwent an MRI of her cervical spine on July 10, 2013. (Tr. 431.) This study revealed as follows:

> Multilevel degenerative changes are present. At the C3-C4 level, there is uncovertebral spurring and advanced facet arthropathy causing mild flattening of the thecal sac without significant canal []narrowing. There is moderate bilateral foraminal narrowing. At the C4-C5 level, there is uncovertebral spurring causing severe left foraminal and mild to moderate right foraminal narrowing. No significant canal stenosis is present. At the C5-C6 level, there is uncovertebral spurring and advanced facet arthropathy causing mild canal stenosis with mild flattening of the spinal cord and moderate bilateral foraminal narrowing. At the C6-C7 level, there is uncovertebral spurring and facet arthropathy causing mild canal stenosis and severe bilateral neural foraminal narrowing. At the C7-T1 level, there is uncovertebral spurring and ligamentum flavum hypertrophy causing mild canal stenosis and mild to moderate left neural foraminal narrowing. There is no frank disk extrusion.

(*Id.*)

On August 23, 2013, Lutizio underwent an MRI of her lumbar spine, which revealed "multilevel degenerative changes which demonstrate progression at L1-2, L2-3, and L3-4," as follows:

> At L1-L2, there has been interval progression of degenerative changes resulting in mild to moderate anterior CSF space effacement. There is no evidence of root compression. At L2-L3 there has been interval progression degenerative changes. There is a broad-based disc osteophyte complex resulting in moderate canal stenosis. Bilateral facet arthropathy. Mild bilateral neural foraminal stenosis. At L3-L4 slight interval progression of the degenerative changes with disc osteophyte complex and broad- based. In addition there is has been progression of bilateral facet arthropathy with a development of a right-sided probable calcified rim synovial cyst resulting in moderate to severe canal narrowing and compression of the right L4 nerve root. At L4-L5 no significant change in the degenerative disease with disc osteophyte complex. Bilateral facet arthropathy. In addition the intervertebral epidural lipomatosis posteriorly resulting in moderate thecal sac compression. There is mild bilateral neural foraminal stenosis.

(Tr. 430.)

Lutizio returned to Dr. Finizia on October 18, 2013. (Tr. 357-358.) She complained of right knee pain, hip pain, chronic mid-back pain, and cervical radiculitis. (*Id.*) Dr. Finizia agreed to refill her pain medications until she could establish care with a new pain management physician. (*Id.*)

On January 3, 2014, Lutizio presented to the ER with right wrist pain, after falling on the ice the night before. (Tr. 352-354.) Examination revealed bony tenderness in her thumb and the dorsal aspect of her right hand and wrist, normal range of motion in all four extremities, intact distal pulses, intact sensation, and normal gait. (*Id.*) Lutizio was discharged home in stable condition with a wrist splint and Vicodin. (*Id.*)

On January 13, 2014, Lutizio underwent an x-ray of her right hand. (Tr. 427.) This imaging revealed "arthritic changes involving the carpal metacarpal articulation of the thumb within the 2nd and 3rd metacarpophalangeal joints with mild subluxation." (*Id.*)

Later that month, Lutizio returned to Dr. Finizia with complaints of elbow and lower back pain. (Tr. 350-351.) Examination revealed tenderness and pain with range of motion in Lutizio's right elbow. (*Id.*) Dr. Finizia ordered imaging of Lutizio's elbow and noted she had been referred to both a rheumatologist and a pain management specialist. (*Id.*)

On March 19, 2014, Lutizio presented to rheumatologist Bassam Alhaddad, M.D. (Tr. 344-347.) She complained of severe degenerative joint disease of the neck and lower back, pain "shooting down from the neck down the arm," shoulder pain, and morning stiffness in her back and hands. (Tr. 345.) Lutizio also reported she had a left knee replacement in April 2011 and "right knee needs to be done as well." (*Id.*) On examination, Dr. Alhaddad noted tenderness in Lutizio's shoulders, elbows and hips; full grip strength; and full range of motion in her wrists,

hips, knees, and ankles.  (Tr. 346.)  He ordered an x-ray of Lutizio's right elbow, which showed a fracture of the right radial neck.  (Tr. 347, 426.)  In addition, Dr. Alhaddad ordered lab work to rule out inflammatory arthropathy.  (Tr. 347.)

On March 24, 2014, Lutizio presented to orthopedist Kevin Malone, M.D., for evaluation of her right elbow pain.  (Tr. 340-343.)  Lutizio rated her elbow pain an 8.5 out of 10 in severity.  (Tr. 341.)  Examination revealed "pain in apprehension to range of motion of the elbow, but . . . very good elbow range of motion."  (*Id*.)  Dr. Malone assessed right radial neck fracture.  (*Id*.)  He raised surgery as an option, but noted "she may lose motion as a result of" the surgery and further stated "[i]t is unlikely that she goes to a completely pain-free situation."  (*Id*.)  Lutizio indicated she was interested in proceeding with surgery.  (*Id*.)

The record reflects Lutizio underwent right elbow arthroplasty on April 9, 2014.  (Tr. 328-337.)  Shortly thereafter, on April 16, 2014, Lutizio presented to the ER with complaints of shortness of breath and cough.  (Tr. 303-326.)  She was admitted for treatment of COPD exacerbation and acute bronichitis.  (*Id.*)  While hospitalized, Lutizio underwent imaging that revealed an "aneurysmal dilatation of the ascending ascending thoracic aorta."  (Tr. 325, 420.)  She was discharged on April 21, 2014 with instructions to follow up with her primary care physician.  (Tr. 324-326.)

On April 22, 2014, Lutizio presented to Dr. Finizia.  (Tr. 301-302.)  He assessed ascending aortic aneurysm, lung nodules, liver lesion, and elbow pain.  (*Id*.)  With regard to her aneurysm, Dr. Finizia recommended she consider evaluation by a vascular surgeon.  (*Id.*)

Two days later, Lutizio returned to Dr. Malone for evaluation status post right elbow surgery.  (Tr. 300-301.)  She rated her pain a 7 on a scale of 10.  (*Id*.)  Dr. Malone found

Lutizio's wound had healed and noted she could tolerate "gentle motion" in her elbow. (*Id.*) He referred her to occupational therapy for a formal post-operative rehabilitation program. (*Id.*)

On May 14, 2014, Lutizio underwent x-rays of her right elbow and lumbar spine. (Tr. 412.) The right elbow x-ray revealed her radial head orthopedic prosthesis was intact. (*Id.*) The lumbar spine x-ray showed mild disc space narrowing at L2-3, L3-4, and L4-5, as well as end plate osteophyte formation and vascular calcifications. (*Id.*)

Lutizio presented to Dr. Malone the following day for follow-up regarding her right elbow. (Tr. 293-294.) She reported "she was doing quite well with making good progress with her range of motion [until] she fell going down a flight of stairs at her home last week and landed on her elbow." (*Id.*) On examination, Dr. Malone noted Lutizio had full elbow extension, no evidence of elbow instability, and "normal radial motor, ulnar motor, and sensory examination of the hand." (Tr. 294.)

On May 22, 2014, Lutizio underwent an x-ray of her bilateral knees. (Tr. 543.) Her left knee x-ray revealed post-surgical changes compatible with left knee arthroplasty with intact surgical hardware. (*Id.*) With regard to her right knee, imaging revealed pancompartmental degenerative change with periarticular osteophytosis and narrowing of the medial tibiofemoral joint compartment. (*Id.*) It also showed patellar spurring, mild narrowing of the medial patellofemoral joint space, moderate joint effusion, and "a new well corticated calcification . . . along the posterior medial soft tissue," which "could be an intra-articular loose body." (*Id.*)

On June 5, 2014, Lutizio presented to pain management physician Preeti Gandhi, M.D., for evaluation. (Tr. 575-582.) She complained of pain in her neck, right arm, right leg, and lower back, which she rated an 8 on a scale of 10. (Tr. 575.) Lutizio described her pain as

"constant ache, burning, shooting at times, and is relieved by nothing." (*Id*.) She stated she had tried acupuncture, physical therapy, pool therapy, heat, ice packs, massage, nerve blocks, and tens units, but continued to have pain. (*Id*.) Lutizio indicated she could stand for 5 minutes, sit for 30 minutes, and walk for 5 minutes. (*Id*.) She reported taking four Percocets a day. (Tr. 577.)

On examination, Dr. Gandhi noted mild to moderately painful range of motion and tenderness to palpation in her cervical and lumbar spines; a slow, antalgic gait; and diffuse hyperreflexia and hyperalgesia. (Tr. 578-579, 582.) Dr. Gandhi found that "while she does have pathology as seen on her imaging studies, in view of [history of] THC use, [history of] ETOH abuse, note of inconsistent tox screen last year, psychiatric co-morbities, she is not a good candidate for treatment with long term opioids." (Tr. 582.) Dr. Gandhi offered back injections, but Lutizio "did not seem interested." (*Id*.) She recommended pool therapy at least three times per week for 30 minutes and a referral to the Chronic Pain Rehabilitation Program at the Cleveland Clinic in order to "resume normal function, regain physical strength and endurance, learn coping skills and stress reduction, get psychological cognitive training, become free of addicting drugs, reduce level of pain and regain control of patient's life." (*Id*.)

On June 27, 2014, Lutizio underwent a CT of her head, which was normal. (Tr. 572-573.) Several weeks later, on July 10, 2014, she underwent an echocardiogram, which revealed normal LV and RV systolic function, no hemodynamically significant valve disease, a dilated left atrium, and dilated ascending aorta (mild-moderate.) (Tr. 570-571.) On July 18, 2014, Lutizio underwent a CT of her chest, which revealed centrilobular emphysema and "interval resolution of the previously seen left lower lobe ground-glass opacities." (Tr. 564-565.)

On December 3, 2014, Lutizio advised Dr. Finizia she had not yet had her right knee surgery due to bronchitis. (Tr. 627.) She reported re-scheduling her surgery for January 8, 2015. (*Id.*) Several weeks later, on December 17, 2014, Lutizio indicated she was considering postponing her surgery until after the winter because her parents were ill and she was worried about being "out in winter." (Tr. 628.)

Lutizio returned to Dr. Finizia on February 25 and April 29, 2015. (Tr. 637-640, 701-704.) On both occasions, she complained of continued knee pain but indicated she had postponed surgery to care for her mother, who had been diagnosed with cancer. (*Id.*)

On April 29, 2015, Dr. Finizia completed a Medical Source Statement regarding Lutizio's Physical Capacity. (Tr. 645-646.) He opined Lutizio could lift and carry 10 pounds occasionally and less than 10 pounds frequently, identifying carpal tunnel syndrome and osteoarthritis of the thumb as medical findings in support of his assessment. (*Id.*) Dr. Finizia also found Lutizio could stand/walk for a total of 1 hour during an 8 hour workday and for less than 1 hour without interruption due to osteoarthritis of her knees. (*Id.*) He concluded she had no limitations in her ability to sit but could rarely climb, balance, stoop, crouch, kneel, and crawl. (*Id.*) Dr. Finizia further found Lutizio was limited to occasional reaching, pushing/pulling, and fine and gross manipulation. (*Id.*) He opined she would need to be able to alternate positions between sitting, standing, and walking at will, and would require additional unscheduled rest periods during an 8 hour workday outside of standard breaks. (*Id.*) Finally, Dr. Finizia noted Lutizio suffered from severe pain (which he rated a 9 on a scale of 10) that would interfere with concentration, take her off task, and cause absenteeism. (*Id.*)

Lutizio returned to Dr. Finizia in July, October, and December 2015.[5]  (Tr. 698-700, 737-741, 768-772, 783-788.)  During each visit, Dr. Finizia conducted limited physical examinations with no abnormal findings.  (*Id.*)  He tracked Lutizio's progress towards scheduling knee and hand surgery, and refilled her pain medications.  (*Id.*)  In addition, on December 2, 2015, he increased Lutizio's Neurontin and temporarily increased her Percocet in response to complaints of increased hand pain.  (Tr. 769.)

On February 2, 2016, Dr. Finizia noted Lutizio needed surgery both for bilateral carpal tunnel syndrome and knee osteoarthritis.  (Tr. 822.)  He refilled her Percocet and continued her on Neurontin.  (Tr. 823.)

## C.    Relevant State Agency Reports

On August 3, 2014, state agency physician Abraham Mikalov, M.D., reviewed Lutizio's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 141-142.)  Dr. Mikalov found Lutizio could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (*Id.*)  He further concluded Lutizio had limited

---

[5]   The Court also notes that, in September 2015, Lutizio went to the ER and was hospitalized due to "increasing anxiety and tremors resulting in multiple falls."  (Tr. 745.) She reported restlessness, agitation, confusion, tremors, dizziness, and palpitations.  (*Id.*) On October 8, 2015, Lutizio underwent a Mental Health Assessment with licensed social worker Michelle Fernandez, LISW-S.  (Tr. 744-754.)  She reported an increase in depressive, anxiety, and panic symptoms.  (Tr. 746.)  Lutizio also noted daily pain in her neck, back, hips, knees, and hands, which she rated an 8 on a scale of 10.  (Tr. 748.)  She stated she enjoyed "shooting pool, gardening, and spending time with her grandson." (Tr. 749.)  On mental status examination, she was anxious and distractible, with normal speech, logical thought process, and fair judgment and insight.  (Tr. 750.)  Ms. Fernandez diagnosed mood disorder, generalized anxiety disorder, and cannabis dependence; and assessed a Global Assessment of Functioning of 51-60, indicating moderate symptoms. (Tr. 750-751.)

push/pull capacity in her right lower extremity and could never climb ladders, ropes, scaffolds and only occasionally stoop, kneel, crouch, and crawl. (*Id*.) With regard to her manipulative limitations, Dr. Mikalov found Lutizio was limited in her ability to reach overhead bilaterally. (*Id*.) Dr. Mikalov explained his RFC assessment was an adoption of the previous ALJ decision dated October 17, 2012. (*Id*.)

On December 10, 2014, state agency physician William Bolz, M.D., reviewed Lutizio's medical records and completed a Physical RFC Assessment. (Tr. 155-156.) He reached the same conclusions as Dr. Mikalov. (*Id*.)

**D.      Hearing Testimony**

During the March 18, 2016 hearing, Lutizio testified to the following:

- She completed the ninth grade and has had no further education or job training. (Tr. 60.) She does not drive because she lost her license in 2012. (Tr. 61-62.) She lives in a three story house with her elderly parents. (Tr. 59-60.) Her bedroom is on the third floor. (Tr. 59.) It is not "not easy to deal with" the steps because she has "two bad knees." (*Id*.)

- She last worked in 2010. (Tr. 63.) She is unable to work because of her hand and knee pain, as well as her memory problems. (Tr. 66.) With regard to her hands, she had carpal tunnel surgery in 2012 and now needs to have surgery in both her hands. (Tr. 71.) She "drops everything" and has difficulty lifting, carrying, buttoning buttons, tying shoes, writing, and using her fingers. (Tr. 71, 79, 88.) Her thumbs "give out on her" throughout the day. (Tr. 71, 79.) She wears a brace on her left hand and takes Neurontin. (Tr. 71.) She has had injections in both her hands but they were not effective. (Tr. 72.)

- With regard to her knees, she had a left knee replacement in April 2011. (Tr. 66-67.) Her left knee still aches but she is not receiving any treatment for it. (Tr. 67.) Her doctors told her she needs a right knee replacement but she is "a little afraid" to have the surgery. (Tr. 68.) She has had right knee injections and takes pain medication. (Tr. 69-70.) The medication takes some of the pain away but it is still difficult to walk. (Tr. 70.)

- She also experiences constant, sharp back pain. (Tr. 68.) She has had back injections and physical therapy. (Tr. 68-69.) She has been taking three

12

Percocets a day for the last year. (Tr. 69-70.) Her doctors told her they would perform neck surgery if she could stop smoking for six months, but she "just couldn't do it." (Tr. 68.) She smokes a pack a day. (Tr. 73.) She has emphysema and uses inhalers on a daily basis. (Tr. 72.)

- She had surgery on her right elbow but it "still bothers her." (Tr. 70-71.) She is not receiving any specific treatment for her right elbow at this time. (*Id.*)

- She can stand/walk for about 15 minutes and can sit for 15- 30 minutes. (Tr. 90.) She cannot carry anything because she has tremors and her "thumbs don't work." (Tr. 79.) Her back pain limits her ability to bend, squat, and kneel. (Tr. 87-88.)

- She suffers from depression and anxiety. (Tr. 73.) She has been in counseling and on medication since 2009. (Tr. 73-74.) Her memory is "really awful" and she has difficulty focusing and concentrating. (Tr. 74.) She becomes easily agitated and is often short-tempered. (Tr. 76, 89.) She has had verbal confrontations with strangers and family. (Tr. 89-90.) She has had two psychiatric admissions. (Tr. 90-91.)

- Her mother does the shopping, laundry, and yard work. (Tr. 80-81.) She [Lutizio] does some sweeping and "picking up" and is able to cook some meals in the microwave. (*Id.*) She babysits her four year old grandson about twice a week; however, she only watches him for short periods of time (about an hour) and when her mother is also there to assist. (Tr. 75-76, 89.)

Adopting the previous ALJ's findings, the instant ALJ found Lutizio had past relevant work as a waitress (light, semi-skilled); clerk/cashier (light, unskilled); office cleaner (light, unskilled); assembler worker (light, semi-skilled); and bartender (light, semi-skilled). (Tr. 65-66.) The ALJ then posed the following hypothetical question:

If you can please assume the individual is the same education, age, and work experience. If you can also please assume in this hypothetical this [person] can perform light work and that the claimant can lift and carry 20 pounds frequently and 10 pounds occasionally; sit for six hours of an eight hour day, stand for six hours of an eight-hour workday, and that this person can have occasional use of right foot controls. * * * Can never climb ladders, ropes, and scaffolds, and never crawl. This individual can occasionally reach above the shoulder, stoop, kneel, or crouch; and that this person should be limited to jobs that involve understanding, remembering, and following simple instructions and directions in a setting that does not require adherence to strict production quotas.

13

(Tr. 95-96.)

The VE testified the hypothetical individual would be able to perform Lutizio's past work as a clerk/cashier as classified in the DOT and, further, would be able to perform other representative jobs in the economy, such as cashier II (light, unskilled, SVP 2), mailroom clerk (light, unskilled, SVP 2), and housekeeping cleaner (light, unskilled, SVP 2). (Tr. 96-97.)

The ALJ then asked a second hypothetical that was the same as the first but added the limitation that "this individual would have frequent bilateral handling and fingering." (Tr. 98.) The VE testified the individual could perform Lutizio's past work as clerk/cashier (as classified in the DOT), as well as the mailroom clerk and housekeeping cleaner jobs. (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). In order to receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 28, 2014, the application date.  (20 CFR 416.971 et seq.)

2. The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spines, osteoarthrosis and allied disorders, bilateral carpal tunnel syndrome, affective disorders, anxiety disorders, and substance addiction disorders.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the  residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can only lift or carry 20 pounds frequently and 10 pounds occasionally;  can sit for 6 hours in an 8 hour workday with normal breaks and stand or walk for 6 hours in an 8 hour workday with normal breaks; she can only occasionally use right foot controls; she can never climb ladders, ropes or scaffolds, or crawl; she can occasionally reach above the shoulder, stoop, kneel or crouch; she is limited to frequent bilateral

handling and fingering; and she is limited to jobs that involve understanding, remembering and following simple instructions and directions in a setting that does not require adherence to strict production quotas.

5.    The claimant is capable of performing past relevant work as a clerk/cashier as it is normally performed in the national economy. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.    The claimant has not been under a disability, as defined in the Social Security Act, since April 28, 2014, the date the application was filed (20 CFR 416.920(f)).

(Tr. 10-20.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner

16

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Treating Physician Dr. Finizia

In her first assignment of error, Lutizio argues the ALJ failed to articulate "good reasons" for rejecting the April 29, 2015 opinion of treating physician Dr. Finizia.  (Doc. No. 15 at 10-15.)  She asserts the ALJ "did not give specific rationale" for her rejection of Dr. Finizia's opinion and failed to cite any record evidence that was inconsistent with that opinion.  (*Id*.)  Lutizio also maintains the ALJ erred by failing to make a finding regarding controlling weight and, further, by failing to address the factors set forth in 20 CFR § 416.927(c).  (*Id*.)  Lastly, Lutizio argues the ALJ's error was not harmless because the decision fails to acknowledge key evidence regarding her carpal tunnel syndrome, hand osteoarthritis, and worsening knee and lumbar conditions.  (*Id*.)

The Commissioner argues the ALJ properly accorded less weight to Dr. Finizia's opinion.  (Doc. No. 17 at 9-16.)  She maintains any failure to articulate "good reasons" constitutes harmless error because "the ALJ comprehensively analyzed the record and properly determined Dr. Finizia's opinion was entitled to less weight, and in doing so, implicitly provided reasons for why his opinion was not entitled to controlling weight."  (*Id*. at 12.)  The Commissioner further asserts "the ALJ's decision demonstrates that his opinion was inconsistent with the record and objective findings."  (*Id*.)  In this regard, she argues diagnostic imaging suggested Lutizio's impairments were not as significant as alleged and "physical examinations

18

did not establish a significant level of functional limitations." (*Id* at 13.)  Lastly, the

Commissioner argues the ALJ's "exhaustive analysis" of the record implicitly considered the

regulatory factors set forth in 20 CFR § 416.927(c).  (*Id*. at 13-14.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v.*

*Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[6]  However,

"a finding that a treating source medical opinion . . . is inconsistent with the other substantial

evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir.

2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[7]  Indeed, "[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[8]  *See also*

*Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion

controlling weight, then the opinion is weighed based on the length, frequency, nature, and

---

[6] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[7] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[8] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[9]

---

[9] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be

In some circumstances, however, a violation of the "good reasons" rule may be considered "harmless error." The Sixth Circuit has found these circumstances present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. *See also Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470–471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 Fed. Appx. 456, 464 (6th Cir. 2005). In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson*, 195 Fed. Appx. at 470–471 (6th Cir. 2006); *Hall*, 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010). In other words, "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend*, 375 Fed. Appx. at 551. As the Sixth Circuit recently explained, however, "'[a] procedural error is not made harmless simply because [the claimant] appears to have ... little chance of success on the merits[,]" *Wilson*, 378 F.3d at 546 (quoting *Mazaleski v. Treusdell*, 562 F.2d 701, 719 n.41 (D.C. Cir. 1977) ); and

_____

considered in assessing any type of medical opinion. *Id*. § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

where the error makes meaningful review impossible, the violation of the good-reasons rule can never qualify as harmless error, *Blakley*, 581 F.3d at 409." *Shields v. Comm'r of Soc. Sec.*, 2018 WL 2193136 at * 8 (6th Cir. May 14, 2018).

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted *supra*, Dr. Finizia submitted an opinion regarding Lutizio's Physical Capacity on April 29, 2015. (Tr. 645-646.) Therein, he concluded Lutizio could lift and carry 10 pounds occasionally and less than 10 pounds frequently, identifying carpal tunnel syndrome and osteoarthritis of the thumb as medical findings in support of his assessment. (*Id.*) Dr. Finizia

also found Lutizio could stand/walk for a total of 1 hour during an 8 hour workday and for less than 1 hour without interruption due to osteoarthritis of her knees. (*Id.*) He determined she had no limitations in her ability to sit but could rarely climb, balance, stoop, crouch, kneel, and crawl. (*Id.*) Dr. Finizia further found Lutizio was limited to occasional reaching, pushing/pulling, and fine and gross manipulation. (*Id.*) He opined she would need to be able to alternate positions between sitting, standing, and walking at will, and would require additional unscheduled rest periods during an 8 hour workday outside of standard breaks. (*Id.*) Finally, Dr. Finizia noted Lutizio suffered from severe pain (which he rated a 9 on a scale of 10) that would interfere with concentration, take her off task, and cause absenteeism. (*Id.*)

The ALJ evaluated Dr. Finizia's opinion as follows:

> Less weight is given to the medical source statement completed by her treating physician, Dr. Finizia dated April 29, 2015 which found that the claimant can lift and carry up to ten pounds occasionally and less than ten pounds frequently, stand and walk for one hour, and rarely climb, stoop, crouch, kneel and crawl and occasionally handle and finger because his treatment records from MetroHealth establish that the claimant is not that limited (Exhibit B11F).

(Tr. 18.) The ALJ included the following physical limitations in the RFC: " After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can only lift or carry 20 pounds frequently and 10 pounds occasionally; can sit for 6 hours in an 8 hour workday with normal breaks and stand or walk for 6 hours in an 8 hour workday with normal breaks; she can only occasionally use right foot controls; she can never climb ladders, ropes or scaffolds, or crawl; she can occasionally reach above the shoulder, stoop, kneel or crouch; she is limited to frequent bilateral handling and fingering." (Tr. 15.)

As an initial matter, the Court notes the Commissioner does not contest that Dr. Finizia was Lutizio's treating physician at the time he authored his opinion. Indeed, the record reflects Lutizio presented to Dr. Finizia on nine (9) occasions between May 2013 and his April 29, 2015 opinion. (Tr. 365, 363-364, 361-362, 357-358, 350-351, 301-302, 628, 637-640, 699-701.) It is further undisputed that the ALJ rejected virtually all of Dr. Finizia's specific opinions regarding Lutizio's physical functional limitations, including his opinions she could lift and carry no more than 10 pounds occasionally and less than 10 pounds frequently; stand/walk for no more than 1 hour total during an 8 hour workday; rarely climb, balance, stoop, crouch, kneel, and crawl; and only occasionally engage in fine and gross manipulation. (Tr. 645- 46.) The ALJ also implicitly rejected Dr. Finizia's opinions regarding Lutizio's need for additional, unscheduled rest periods and the ability to sit/stand at will. (*Id.*)

For the following reasons, the Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Finizia's April 29, 2015 opinion. The ALJ provides no specific reasons for rejecting Dr. Finizia's lifting, standing/walking, and postural limitations, stating only Dr. Finizia's "treatment records from MetroHealth establish that the claimant is not that limited." (Tr. 18.) The ALJ does not, however, explain the basis for her conclusion that Dr. Finizia's treatment records fail to support this opinion, nor does she identify any particular treatment records that are inconsistent with his opinion. Moreover, the ALJ fails entirely to acknowledge or address Dr. Finizia's opinion Lutizio would require unscheduled breaks and a sit/stand at will option, or that Lutizio's severe pain would take her off task and cause absenteeism.

The Court finds that, standing alone, the ALJ's unexplained statement that Dr. Finizia's treatment records "establish that the claimant is not that limited" does not constitute a "good

reason" for rejecting his opinion.  Indeed, the Sixth Circuit has repeatedly made clear that an

ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent

with the medical evidence of record, does not constitute a "good reason" for rejecting these

opinions. *See, e.g., Friend*, 375 Fed. Appx. at 552 ("Put simply, it is not enough to dismiss a

treating physician's opinion as 'incompatible' with other evidence of record; there must be some

effort to identify the specific discrepancies and to explain why it is the treating physician's

conclusion that gets the short end of the stick"); *Rogers*, 486 F.3d at 245-246 (finding an ALJ

failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion

where the ALJ merely stated, without explanation, that the evidence of record did not support the

severity of said limitations); *Bartolome v. Comm'r of Soc. Sec.*, 2011 WL 5920928 (W.D. Mich.

Nov. 28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate

regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010

WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any

rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent

with the objective medical evidence and appears to be based solely on [claimant's] subjective

performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr. 23, 2012)

(finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating

physician's opinion without identifying any contradictory evidence or explaining which findings

were unsupported).

The ALJ's failure to provide a reasoned explanation for rejecting Dr. Finizia's opinion

is problematic because the medical record contains evidence potentially consistent with that

opinion.  As noted *supra*, diagnostic imaging of Lutizio's cervical and lumbar spines revealed

numerous abnormal findings.  Specifically, the July 2013 MRI of Lutizio's cervical spine showed (among other things) moderate bilateral foraminal narrowing at C3-C4; severe left foraminal narrowing at C4-C5; and severe bilateral foraminal narrowing at C6-C7.  (Tr. 431.) An August 2013 MRI of her lumbar spine showed mild to moderate degeneration at L1-L2 and L2-L3, but also revealed moderate to severe canal narrowing at L3-L4 and compression of the right L4 nerve root.  (Tr. 430.)  With regard to Lutizio's right knee, x-rays in May 2013 and May 2014 showed advanced medial compartment narrowing and joint effusion.  (Tr. 543, 544.) Consistent with this imaging, physical examination findings in June 2014 showed painful range of motion and tenderness to palpation in Lutizio's cervical and lumbar spines; a slow, antalgic gait; and diffuse hyperreflexia and hyperalgesia.  (Tr. 578-579, 582.)

With regard to Lutizio's hands, an x-ray of her left hand from February 2013 showed advanced osteoarthritic changes within the 1st carpometacarpal joint with joint space narrowing and spurring.  (Tr. 373, 435.)  Examination in January 2014 revealed bony tenderness about the thumb and dorsal aspect of Lutizio's right hand, and x-rays of her right wrist and hand showed advanced osteoarthritis within the 1st carpometacarpal joint.  (Tr. 427.)  In March 2014, Lutizio complained of morning stiffness and pain in her bilateral hands and examination revealed ulnar deviation and bony swelling of the 2nd MCP joints with squaring of her thumbs and tenderness of her CMC joints.  (Tr. 347.)  The ALJ does not sufficiently explain how Dr. Finizia's opinion is inconsistent with the above evidence.

Having found the ALJ failed to articulate "good reasons" for rejecting Dr. Finizia's opinion, the question remaining is whether the ALJ's failure to do so constitutes "harmless error."  As set forth *supra*, the Sixth Circuit has found that a violation of the "good reasons" rule

may be considered "harmless error" where "the Commissioner has met the goal of § 1527(d)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. Specifically, the Court has explained the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of the record as a whole. *See Nelson*, 195 Fed. Appx. at 470–471 (6th Cir. 2006); *Hall*, 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend*, 375 Fed. Appx. at 551.

Relying on *Wilson* and *Hall*, the Commissioner herein asserts the ALJ's failure to articulate good reasons constitutes "harmless error" because the ALJ "exhaustively analyzed the record" earlier in the decision and "in doing so, implicitly provided reasons for why his opinion was not entitled to controlling weight." (Doc. No. 17 at 12, 16.) The Court disagrees. While the Commissioner cites five pages of transcript in support of her assertion that the ALJ "exhaustively analyzed" the medical record, a careful review of the decision reflects the ALJ's entire discussion of the medical evidence regarding Lutizio's physical impairments is confined to a single paragraph, as follows:

> The claimant alleges that she is disabled by her back pain. The evidence establishes that the claimant underwent a MRI of the cervical spine on July 10, 2013, which demonstrated multilevel spondylotic changes of the cervical spine, which have been described as mild to moderate (Exhibits B1F, p. 141; B6F, pp. 21-22). She underwent a MRI of the lumbar spine on August 23, 2013, which showed multilevel degenerative changes that demonstrated progression at L1-2, L2- 3, L3-4 (Exhibit B1F, p. 140; B6F, p.21). She also underwent a lumbar spine x-ray on May 14, 2014, which demonstrated mild disc space narrowing at L2-3, L3-4 and L4-5 as well as end plate osteophyte formation (Exhibits B1F, p. 157; B6F, p.20). The evidence establishes that the claimant underwent a left knee replacement on April 20, 2011 (Exhibit B1F, p.69). Radiographic studies of the left knee note that it is intact (Exhibits B3F, pp.5-6; B6F, p.20). An x-ray of the claimant's right knee dated May 22, 2013 demonstrated right knee osteoarthritis (Exhibit B3F, p.6). An x-ray of the right knee dated May 22, 2014 noted

pancompartmental degenerative change present with periarticular osteophytosis and narrowing of the medial tibiofemoraljoint compartment.  There is patellar spurring and mild narrowing of medial  patellofemoral joint space. There was also a well corticated calcification 12 x 8 mm seen along the posterior medial soft tissues at the level of the fibular head.  There was moderate joint effusion (Exhibit B3F, p.5). The evidence indicates that the claimant is supposed to have total knee replacement surgery on the right knee but she keeps postponing the surgery (Exhibits B10F, p.2;  B16F, p.87).  The evidence also indicates that the claimant has bilateral carpal tunnel syndrome.  She also needs carpal tunnel surgery but she keeps postponing this surgery as well (Exhibits B1F, p.2; B16F, pp. 87-88).  Nevertheless, despite the evidence on radiographic studies and her postponement of surgeries, physical examinations have noted normal sensation, good to normal muscle strength, and essentially normal reflexes (Exhibits B1f, p.17; B6F, p.20; B14F, p.33).

(Tr. 16.)

The Court finds the above discussion of the medical evidence fails to indirectly attack the supportability or consistency of Dr. Finizia's opinion.  The majority of the ALJ's discussion is simply a recitation of the various imaging undertaken of Lutizio's cervical spine, lumbar spine, and knees.  There is no *analysis* of this evidence or *explanation* of how it is inconsistent with Dr. Finizia's opinion.  Moreover, the ALJ's recitation of the results of Lutizio's imaging is, in some cases, incomplete and misleading.  For example, the ALJ notes the July 2013 MRI of Lutizio's cervical spine demonstrated "demonstrated multilevel spondylotic changes of the cervical spine, which have been described as mild to moderate."  (Tr. 16.)  The ALJ fails to mention, however, that that same MRI also revealed *severe* left foraminal narrowing at C4-C5 and *severe* bilateral foraminal narrowing at C6-C7.  (Tr. 431.)  Similarly, the ALJ states the August 2013 MRI of Lutizio's lumbar spine showed "multilevel degenerative changes that demonstrated progression at L1-2, L2-3, L3-4," but fails to acknowledge that it also revealed moderate to severe canal narrowing at L3-L4 and compression of the right L4 nerve root.  (Tr. 430.)

The Commissioner argues the ALJ provided sufficient explanation for rejecting Dr. Finizia's opinion when she found that, "despite the evidence on radiographic studies and her postponement of surgeries, physical examinations have noted normal sensation, good to normal muscle strength, and essentially normal reflexes (Exhibits B1F, p.17; B6F, p.20; B14F, p.33)." (Tr. 16.) The Court disagrees. While the ALJ references some normal examination findings regarding Lutizio's physical impairments,[10] the decision fails entirely to acknowledge or address the many abnormal findings in the record. First, and as noted above, the ALJ fails entirely to acknowledge the more serious findings in Lutizio's diagnostic imaging results, including findings of (1) severe foraminal narrowing in her cervical spine; (2) moderate to severe canal narrowing and nerve root compression in her lumbar spine; (3) advanced medial compartment narrowing and joint effusion in her right knee; and (4) advanced osteoarthritic changes within the 1st carpometacarpal joint of her left hand with joint space narrowing and spurring. (Tr. 430, 431, 543, 544, 373, 435.) In addition, the ALJ fails to acknowledge or address abnormal physical examination findings in the record, including (1) painful range of motion and tenderness to palpation in Lutizio's cervical and lumbar spines; (2) slow, antalgic gait; (3) diffuse hyperreflexia and hyperalgesia; (4) bony tenderness about the thumb and dorsal aspect of

_____

[10] The ALJ cites three medical records (i.e., "Exhibits B1F, p.17; B6F, p.20; B14F, p.33") in support of the assertion that "physical examinations have noted normal sensation, good to normal muscle strength, and essentially normal reflexes." (Tr. 16.) The ALJ's characterization of these records is, in some instances, not entirely accurate. For example, "Exhibit B6F, p. 20" refers to Dr. Gandhi's June 5, 2014 treatment note. (Tr. 579.) While this note does arguably indicate "good" (i.e., 4/5) muscle strength, it also notes abnormal reflexes in Lutizio's knees and brachioradialis, as well as slow, antalgic gait. (*Id.*)

Lutizio's right hand; and (4) ulnar deviation and bony swelling of the 2nd MCP joints with squaring of her thumbs and tenderness of her CMC joints. (Tr. 578-579, 582, 347.)

As this Court has noted on previous occasions, federal courts have not hesitated to remand where an ALJ selectively includes those portions of the medical evidence that place a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 at * 6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that point to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 at * 4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The Commissioner nonetheless argues the ALJ properly rejected Dr. Finizia's opinion because "all of the evidence cited by Plaintiff pre-dates her SSI application date and none of the evidence is from Dr. Finizia's treatment records." (Doc. No. 17 at 14.) She also emphasizes that Dr. Finizia did not opine Plaintiff had any work limitations due to her lumbar or cervical spine condition and, further, that Dr. Finizia did not note any knee or gait abnormalities in his treatment records. (*Id*. at 15.) Finally, the Commissioner notes Lutizio's testimony "she lived in

a third floor room and used the basement, rather than the second-floor bathroom, by her own preference." (*Id.* at 16.)

The Commissioner, however, cannot cure a deficient opinion by offering explanations that were not offered by the ALJ. As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012). Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ, either as reasons for rejecting Dr. Finizia's opinion or generally in her discussion of the medical evidence at step four. Accordingly, this Court rejects the Commissioner's *post hoc* rationalizations.

For all the reasons set forth above, the Court finds the ALJ erred in failing to articulate "good reasons" for rejecting Dr. Finizia's opinion and, further, that the failure to do so was not "harmless error." Although there may be good reasons to reject Dr. Finizia's opinion, the ALJ is required to articulate those reasons in order to allow for meaningful appellate review. Because the ALJ failed to do so here, the Court finds remand is required for further consideration of Dr. Finizia's opinion.

### *RFC*

In her final assignment of error, Lutizio argues the RFC is not supported by substantial evidence. (Doc. No. 15.) She maintains "the ALJ relied on selective portions of the medical record to ascertain Ms. Lutizio's functional capacity," arguing the ALJ erred in finding she could

perform the physical demands of light work and return to her past work as a clerk/cashier. (*Id.* at 15.) In particular, Lutizio emphasizes medical evidence documenting a worsening of her right knee, lumbar, and cervical conditions, as well as her testimony that she has severe difficulty using her hands for "most all activities." (*Id.* at 16.) She asserts the ALJ "failed to review and incorporate key medical records which bear directly upon Ms. Lutizio's ability to perform work-related activities." (*Id.* at 17.)

The Commissioner argues substantial evidence supports the RFC. (Doc. No. 17 at 16.) She maintains the RFC is consistent with the medical record as a whole, including diagnostic imaging and physical and mental examination finding. (*Id.*) The Commissioner further asserts the RFC is supported by the opinions of the state agency physicians. (*Id.* at 18.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).[11] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision,

---

[11] This regulation has been superseded for claims filed on or after March 27, 2017. As Lutizio's application was filed in April 2014, this Court applies the rules and regulations in effect at that time.

especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010)

("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute [...] contradictory, objective

medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184(SSA July

2, 1996) ("The RFC assessment must always consider and address medical source opinions. If

the RFC assessment conflicts with an opinion from a medical source, the adjudicator must

explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine,

however, it is well established that the claimant bears the burden of establishing the impairments

that determine his RFC. *See Her*, 203 F.3d at 391.

      As the Court has found this matter should be remanded for further consideration of Dr.

Finizia's April 29, 2015 opinion, it is possible the ALJ's RFC determination may change on

remand. Thus, the Court will not address all of the parties' arguments regarding the alleged

deficiencies in the ALJ's discussion of the medical evidence at step four. On remand, however,

the ALJ should conduct a thorough and complete review of the medical evidence relating to

Lutzio's physical impairments, including evidence relating to her ongoing cervical, lumbar,

knee, and hand pain.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and the

case REMANDED for further consideration in light of this decision.

**IT IS SO ORDERED.**


                                         *s/Jonathan D. Greenberg*
                                         Jonathan D. Greenberg
                                         United States Magistrate Judge

Date: July 23, 2018